IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TOKIO MARINE NICHIDO FIRE      )
INSURANCE CO. LTD., et al,      )          Civil No. 06-929-JE
                                )
              Plaintiffs,       )          OPINION AND ORDER
                                )
        v.                      )
                                )
UNITED STATES OF AMERICA,       )
                                )
              Defendant.        )
_____ )

    William R. Bennett III
    Bennett, Giuliano, McDonnel & Perrone, LLP
    225 West 34th Street, Suite 402
    New York, NY 10122-0402

    Elaine J. Brown
    Bob Spajic
    Gordon & Polscer, LLC
    9755 S.W. Barnes Road
    Portland, OR 97225

          Attorneys for Plaintiffs


    R. Michael Underhill
    US Department of Justice
    Torts Branch Civil Division
    450 Golden Gate Avenue, Room 7-5395
    P.O. Box 36028
    San Francisco, CA 94102-3463

Karin J. Immergut
U.S. Attorney
Ron Silver
Asst. U.S. Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

        Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiffs Tokio Marine Nichido Fire Insurance Co. Ltd., Fortis Corporate Insurance SA, Winterthur Europe Verzekerigen NV, Aegon Schadeversekeringen NV, General Schadeverzekeringmaatschappu NV, Gerling-Konzern Allegemeine-Versicherungs-AG, AFG Belgium Insurance NV, Avero Schaderverzekering Benelux NV, and Sompo Japan Insurance bring this admiralty action against defendant the United States of America (the United States). The United States moves to dismiss for lack of subject matter jurisdiction.

For the reasons set out below, I grant the motion.


## BACKGROUND

This action is brought by eleven insurers who issued policies covering loss or damage to vehicles stored at Quay 1241 on the Hesse Noord Natie (HNN) car terminal in Antwerp, Belgium. Plaintiffs allege that a number of Mazda vehicles stored at Quay 1241 were damaged by oily soot discharged by the SS Cape Inscription (Cape Inscription) between 3:00 p.m. on September 8, 2004, and 7:00 a.m. on September 9, 2004.

The Cape Inscription is a twin boiler plant steamship that is part of the "Ready Reserve Force" (RRF), which is a part of the National Defense Reserve Fleet (NDRF). It is owned by the United States through the Maritime Administration (MARAD). During all times relevant to this action, the Cape Inscription was operated on behalf of the United States by Crowley Liner Services, Inc. (Crowley), which manned, equipped, maintained, and operated the vessel pursuant to a contract with the United States.

At the time of the incident giving rise to this action, the Cape Inscription was operating under the command of the United States Navy, Military Sealift Command (MSC),

2 - OPINION AND ORDER

and was carrying cargo solely on behalf of the United States Government and the Department of Defense. During the early summer of 2004, the Cape Inscription's operating status was changed from "reduced operating status" (ROS) to "full operating status" (FOS) or "Phase O" status.

When the Cape Inscription was activated to "Phase O" status, it was under the control of the United States Navy, and was subject to the MSC "Standard Operating Manual" (MSC SOM).[1] While subject to the MSC SOM, the Cape Inscription was required to be maintained in the highest state of readiness so that it could respond immediately to operational orders of the Navy, passed through MSC. This included the requirement that the vessel be ready to sail immediately and without delay at any given time, as ordered by the Navy through MSC. The contract between Crowley and MARAD similarly required the Ship Manager of the Cape Inscription to ensure that all of the vessel's "equipment, machinery, and appurtenances" were "maintained in the highest state of readiness and operation throughout Phase O."

Before embarking on the voyage giving rise to this action, the Cape Inscription took on fuel at its home port of Long Beach, California, in July, 2004. It then sailed to the Far East, making several ports of call, and taking on fuel at Pusan, Korea, and Fujaira, United Arab Emirates (UAE). Though relevant regulations required Crowley to pre-test the fuel to ensure quality, the Cape Inscription's Chief Engineer failed to do so when the Cape Inscription refueled in Korea and the UAE. During the time of the incident giving rise to this action, the Cape Inscription was burning fuel it had loaded in Fujaira, UAE. A sample of the fuel provided to the Cape Inscription when it took on fuel in Fujaira, UAE, was tested after the incident, and was found to be proper and adequate for the Cape Inscription's steam plant and combustion system.

---

[1]Plaintiffs moved to strike the pending motion to dismiss on the grounds that defendant failed to produce this document in discovery. At the close of oral argument on that motion held on February 4, 2009, I denied the motion because I concluded that the document was relevant in determining the existence of this court's subject matter jurisdiction, and that this is a matter that is not subject to waiver or estoppel. As noted in the discussion below, even if I had concluded the MSC SOM was not admissible because it had been improperly withheld during discovery, I would still conclude that the motion to dismiss should be granted because other material whose proper disclosure is not in doubt establishes that this court lacks subject matter jurisdiction.

Because fuel does not completely burn, soot builds up in the "tubes" of steamships like the Cape Inscription. In order to clear this material, steamships commonly "blow" the tubes while at sea. The Cape Inscription's standard practice was to blow its tubes every 24 hours while it was at sea, in a process that lasted approximately an hour. When the Cape Inscription arrived at Quay 1241 in Antwerp, it had completed a 9-hour transit through the port of Antwerp, and its tubes had not been blown for approximately 36 hours.

The Cape Inscription tied up at Quay 1241 of the HNN terminal at approximately 1:30 a.m. on September 8, 2004. The vessel offloaded government cargo and left the terminal at approximately 2:00 p.m. on September 9, 2004. During the time that the Cape Inscription was in the port of Antwerp, both of its boilers were kept "on line," with a low power load. According to the deposition testimony of John Daley, the Cape Inscription's Chief Engineer, the Cape Inscription was not required to keep both boilers on line at all times, but it is standard operating procedure to keep both boilers on line while in port.

Maik Darley, the Cape Inscription's Captain, has submitted a declaration stating that, because the vessel could not make "full power" when one of the steam boilers was shut down, while the vessel was in Antwerp in September, 2004, he "would *not* have permitted *either* of the ship's two boilers to be shut down intentionally except in the event of an emergency, that is, an emergency that would have threatened the ship, her cargo, her crew, and/or her mission *unless* the boiler was shut down." [Emphasis in original.] Captain Darley added that shutting down one boiler would have reduced the Cape Inscription's ability to get underway immediately with full power, and would have "violated the policy that all RFF ships, once activated, remain fully operational at all times, so as to be able to respond immediately and without delay to the national security needs and requirements of the Dept. of Defense."

Frank Linehan, a MARAD Contracting Officer's Technical Representative, has submitted a declaration stating that RRF policy requires that all activated vessels like the Cape Inscription remain fully operational at all times, and be "ready to sail immediately and

4 - OPINION AND ORDER

without any delay, at any given time . . ."  He also states that operating the Cape Inscription on one boiler would have violated that policy.

The HNN terminal can hold approximately 60,000 vehicles.  Between approximately 7:00 a.m. and 3:00 p.m. on September 8, 2004, more than 500 cars underwent a detailed inspection as part of the terminal's regular process for inspecting cars that were unloaded at the terminal for shipment to dealers throughout Europe.  No soot damage was observed on any of those vehicles.  When inspection resumed at approximately 7:00 a.m. the next day, soot contamination and paint damage were discovered on many cars in the area next to where the Cape Inscription was moored.   A short time later, Mazda's representatives and others boarded the Cape Inscription and alleged that the cars had been damaged because the Cape Inscription improperly emitted soot between the time the inspection ceased on September 8 and resumed on September 9.

Barwil Benelux, defendant's agent in Belgium, appointed two surveyors to represent the Cape Inscription's interests, and HNN sent a surveyor to the vessel.  During that visit, the Cape Inscription's Master and Chief Engineer met with several surveyors and allowed a joint survey to be conducted so that soot samples could be gathered.  In addition, a joint survey of the damaged vehicles was conducted.  The most seriously damaged cars were located directly alongside the Cape Inscription, to the side sheltered from the winds at the time of the incident, and the severity of the damage decreased as the distance from the vessel increased. The Cape Inscription itself was not covered in soot.

The parties agree that the damage occurred sometime after the inspection process was completed on the afternoon of September 8, 2004, and before inspection operations resumed on the morning of September 9, 2004.  However, there were no eyewitnesses to the incident, and there are no videos from surveillance cameras showing the source of the contamination. The Cape Inscription was the only vessel moored next to the quay where the damage occurred during that time.  Another vessel, the Crane Arrow, maneuvered near the Cape Inscription during the 12-hour period during which the incident occurred.  However, there is

no evidence that any engine orders were given on the Crane Arrow while it was alongside the Cape Inscription.

Plaintiffs allege that the soot was discharged by the Cape Inscription and that it severely damaged the paint on several hundred vehicles at Quay 1241, resulting in approximately $1,900,000 in damages. They allege that this damage was caused by "the fault, carelessness, and/or negligence" of defendant, the United States. In their memorandum opposing defendant's motion to dismiss, plaintiffs contend that the Cape Inscription emitted oily soot from its stack while moored at the HNN terminal because "the Chief Engineer failed to pre-test the fuel loaded aboard the CAPE INSCRIPTION in Buson, Korea and Fujairah UAE to insure its quality," and because operating both boilers while in port caused the "efficiency of the plant" to drop significantly, which resulted in incomplete combustion and the release of soot.

## EVALUATING MOTIONS TO DISMISS PURSUANT TO RULE 12(b)(1)

A moving party may base a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack or jurisdiction on the allegations of the complaint, or may bring a factually based motion "by presenting affidavits or other evidence properly brought before the court . . . ." Savage v. Glendale Union High School, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003), cert. denied, 541 U.S. 1009 (2004). If the motion to dismiss for lack of jurisdiction is factually based, the court may look beyond the allegations of the complaint. Id. (citing White v. Lee, 227 F.3d, 1214, 1242 (9th Cir. 2000)). If the moving party supports a motion to dismiss for lack of jurisdiction with evidence, the nonmoving party "must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Id. The court's consideration of extrinsic evidence presented in support of and opposition to a motion to dismiss for lack of subject matter jurisdiction does not convert the motion to a motion for summary judgment. McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988), cert. denied, 489 U.S. 1052 (1989). If necessary, a court presented with a factually based motion

6 - OPINION AND ORDER

to dismiss on jurisdictional grounds may resolve factual disputes.  See Berardinelli v. Castle & Cooke, Inc., 587 F.2d 37, 39 (9th Cir. 1978).


## DISCUSSION

I. Discretionary Function Immunity

Because it is sovereign, the United States is immune from suit, except to the extent that it consents to be sued.  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The terms of the United States' consent to be sued define the jurisdiction of federal courts over actions brought against the United States.  Id.

Governmental immunity for discretionary functions is set out in the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2672-2680.  The FTCA limits the United States' waiver of sovereign immunity by providing that the waiver will not apply to

> [a]ny claim based upon the act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. §2680(a).

The present action is brought pursuant to the Suits in Admiralty Act (SAA), now codified at 46 U.S.C. §§ 30901-18, and the Public Vessels Act (PVA), 46 U.S.C §§ 31101-31113.  Though neither the SAA nor the PVA expressly incorporates the exception to the waiver of sovereign immunity for discretionary functions set out in the FTCA, this immunity applies to both the SAA and PVA by implication.  See, e.g., Thames Shipyard and Repair Co. v. United States, 350 F.3d 247, 254 (1st Cir. 2003),  cert. denied, 542 U.S. 905 (2004); Limar Shipping Ltd. v. United States, 324 F.3d 1, 6-7 (1st Cir. 2003)(SAA); Baldassaro v. United States, 64 F.3d 206, 208 (5th Cir. 1995), cert. denied, 517 U.S. 1207 (1996) (SAA); United States Fire Ins. Co. v. United States, 806 F.2d 1529, 1535 (11th Cir. 1986)(PVA); United Cook Inlet Drift Ass'n v. Trinidad Corp. (In re Glacier Bay), 71 F.3d 1447, 1450 (9th Cir. 1995) (Glacier Bay)(SAA).

Determining whether discretionary function immunity applies requires a two-step analysis.  E.g., Glacier Bay, 71 F.3d at 1450.  If both parts of this analysis are satisfied, the court must dismiss the action for lack of jurisdiction.  Sigman v. United States, 217 F.3d 785, 793 (9th Cir. 2000).  The first question is whether the conduct in question "involve[s] an element of judgment or choice" on the part of the acting employee.  Berkovitz v. United States, 486 U.S. 531, 536; Glacier Bay, 71 F.3d at 1450.  If not, such as when a federal statute, regulation, or policy specifically prescribes a particular course of action for an employee to follow, the exception does not apply.  Berkovitz, 486 U.S. at 536; Glacier Bay, 71 F.3d at 1450.

Discretionary function immunity is intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of a tort action."  United States v. Gaubert, 499 U.S. 315, 324 (1991).  Therefore, if the conduct involves an element of judgment or choice, the next question is whether the choice or judgment involved is susceptible to the type of social, economic, or political policy considerations that Congress intended to be shielded by the discretionary function exception.  Id.  (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense, 467 U.S. 797, 813 (1984)).

If the conduct at issue involves a discretionary function, questions of fault are irrelevant, because immunity attaches even if the employee has abused his discretion.  See Mitchell v. United States, 787 F.2d 466, 468 (9th Cir. 1986); Kennewick Irrigation District v. United States, 880 F.2d 1018, 1029 (9th Cir. 1989).  In analyzing the applicability of discretionary function immunity, the focus is not on the employee's "subjective intent in exercising the discretion . . . but on the nature of the actions taken and on whether they are susceptible to policy analysis."  Gaubert, 499 U.S. at 324-25.  If "established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed" that, in exercising that discretion, the agent's acts were "grounded in policy."  Id.

The Ninth Circuit Court of Appeals has reiterated that, in order for discretionary function immunity to apply, the decision in question " 'need not *actually* be grounded in policy considerations' so long as it is 'by its nature, susceptible to a policy analysis.' " Nurse v. United States, 226 F.3d 996, 1001 (9th Cir. 2000) (quoting Miller v. United States, 163 F.3d 591, 593 (9th Cir. 1998)).  Discretionary function immunity is not limited to decisions at the "policy or planning level," but instead applies as well to "[d]ay to day management" decisions that involve choice or judgment.  Gaubert, 499 U.S. at 325.

If the discretionary function exception to the waiver of sovereign immunity applies, federal subject matter jurisdiction does not exist.  Glacier Bay, 71 F.3d at 1450; Lesoeur v. United States, 21 F.3d 965, 967 (9th Cir. 1994).


II. Analysis

As noted above, plaintiffs contend that the Cape Inscription emitted soot, damaging hundreds of automobiles in the parking lot adjacent to Quay 1241 in Antwerp, because its personnel had failed to verify the quality of fuel it was burning at the time, and because keeping both its boilers operating while in port resulted in incomplete combustion and the release of soot.  They contend that discretionary function immunity does not attach because the crew of the Cape Inscription were not government employees or agents, and because the conduct in question was not of the type protected by this exception to tort liability.


A. Status of the Cape Inscription's Crew

The Cape Inscription is owned by the Maritime Administration (MARAD).  It is a public vessel of the United States, and is part of the National Defense Reserve Fleet (NDRF).  During the time relevant to this action, the Cape Inscription was subject to the control of the United States Navy and the Navy's operational requirements.  Crowley, the ship manager, operated the vessel on behalf of the United States.

MARAD ship managers operate as agents of the United States Government.  46 C.F.R. § 315.3.  As government agents, they are required to perform the duties "prescribed in

the . . . Ship Manager Contract" and to be "guided by such directions, orders or regulations as may be issued by MARAD." 46 C.F.R. § 315.9.

Defendant correctly notes that both the PVA and SAA provide for waiver of the United States' sovereign immunity in admiralty actions involving public vessels such as the Cape Inscription. Such a waiver would not be required if the ship operators were not considered government agents, because if they were not, the United States would not be potentially liable for their conduct in any event. Defendant also correctly notes that courts consider operators of Navy Military Sealift Command vessels such as the Cape Inscription as "agents" or "employees" of the United States for the purpose of discretionary function immunity analysis. E.g., Dearborn v. Mar Ship Operations, Inc., 113 F.3d 995, 1000 (9th Cir. 1995) (charterer of vessel owned by U.S. through Military Sealift Command was agent of U.S. within meaning of SAA); Baldessaro, 64 F.3d at 207 (seaman injured while working on vessel that was part of RRF was employee of U.S. for purposes of SAA).

The Master and officers of the Cape Inscription were acting as agents or employees of the United States when the Cape Inscription was operating in "Phase O" status. They were acting on behalf of the United States when the incident giving rise to this action occurred, and the discretionary function exception to tort liability potentially applies.

B. Applicability of Discretionary Function Immunity

1. Failure to Pre-Test Fuel

When his deposition was taken, James Dolan, plaintiff's expert, criticized only the decision to keep both of the Cape Inscription's boilers "on line" while the vessel was docked at Antwerp. Dolan stated that:

> Basically, my criticism is that having not taken one of the boilers off the line, the efficiency of the plant dropped significantly because you had two boilers on line. That coupled with the time that it was marching on from when they blew tubes in my opinion led to particulate matter ending up going up the stack on the 8th, evening of the 8th and 9th. So the only thing I'm saying that I would have done differently would have been to cut the boiler off.

When asked again if he had identified any other causes of the Cape Inscription's alleged discharge of the oily soot that damaged the vehicles at Antwerp, he replied: "There really isn't any other.  The tubes, there's nothing much you can do.  As you get close enough you can't blow tubes."  In his report prepared for plaintiffs, Dolan stated that

> To maximize the burning of fuel in marine boilers, and to reduce the risk of solid particulate matter being emitted from the ship's stack, given the combustion control systems and the loads imposed is to reduce boiler capacity to near the load requirement and the normal way to accomplish this is to take one boiler off-line during the low load conditions such as in-port when the primary steam user, the propulsion turbine, is off line.

However, in their response to defendant's motion to dismiss for lack of subject matter jurisdiction, plaintiffs cite as causes of the discharge of soot giving rise to this action both the decision to keep both of the Cape Inscription's boilers on line while in port, and the failure to pre-test the fuel the vessel took on in July, 2004,  in Pusan, Korea, and in Fujaira, UAE, in August, 2004.  Plaintiffs contend that, because Crowley's contract with MARAD required that fuel be pre-tested, the discretionary function immunity exception does not apply.

In analyzing the pending motion to dismiss, I need not determine how, if any evidence existed supporting the conclusion that a failure to pre-test fuel may have contributed to the damages at issue here, that failure would affect the analysis of discretionary function immunity in this action.  That determination is irrelevant, because there is simply no evidence that the damage to the vehicles in Antwerp could have been caused by a problem with the Cape Inscription's fuel.  Defendant has cited unrebutted evidence that a sample of the fuel the Cape Inscription was burning on September 8th and 9th of 2004 was tested by an independent laboratory agreed upon by the parties, according to protocols proposed by plaintiffs, and was found to be wholly appropriate for the vessel. Defendant has also cited unrebutted evidence that the Cape Inscription had experienced no problems with fuel during any part of its voyage, including the portion completed after taking on the fuel it was burning in Antwerp.

In the absence of any evidence that any of the damage to vehicles parked on the quay in Antwerp resulted from problems with the Cape Inscription's fuel, any arguments concerning failure to pre-test fuel are irrelevant.

2. <u>Decision to Keep Both Boilers On Line While in Port</u>

a. <u>First Prong of Discretionary Function Analysis: Element of Choice or Judgment</u>

As noted above, in analyzing the applicability of discretionary function immunity, the first question is whether the conduct at issue "involve[s] an element of judgment or choice" on the part of the government employee or agent. <u>Berkovitz</u>, 486 U.S. at 536.

Plaintiffs first argue that the discretionary function exception does not apply to the decision to keep both boilers on line while the Cape Inscription was in port because mandatory policy required that both boilers be kept on line, and that this policy was followed. Before discussing my disagreement with this assertion, I note that defendant could not be liable if plaintiffs' contention in this regard were correct. In <u>Gaubert</u>, the Court noted that, "[u]nder the applicable precedents . . . if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." <u>Gaubert</u>, 499 U.S. at 323. Therefore, <u>if</u> relevant mandatory policy required that both boilers be kept on line, and the Cape Inscription's crew complied with that policy, defendant would not be liable.

This analysis does not apply here, however, because the record before the court establishes that the operators of the Cape Inscription had the discretion to determine whether to keep both boilers on line while the vessel was in port. There is no question that, under the contract between Crowley and defendant, when the Cape Inscription was activated from Reduced Operating Status (ROF) to Full Operational Status ("O" status), control of the vessel passed to defendant, and the vessel became an operational part of the United States Navy. Under Section 7.3.12.8 of the contract, the Ship Manager of the Cape Inscription is required to "ensure that all equipment, machinery, and appurtenances of the ships, regardless of the

frequency or importance of use, is maintained in the highest state of readiness and operation throughout Phase O."

However, the parties have cited, and I have found in the materials before the court, no regulation, policy, or contractual provision that specifically instructs those operating a vessel like the Cape Inscription as to how many boilers shall remain on line and how the boilers shall be operated while a vessel in "O" status is in port.  In the absence of such a mandate, decisions concerning boiler operation, like many other decisions affecting a vessel's readiness, involve questions of judgment and choice.  Accordingly, the first prong of discretionary function immunity is satisfied.


b.  Second Prong: Is the Choice or Judgment in Question Susceptible to Policy
Considerations Protected by the Discretionary Function Exception?

The  second issue is whether the choice or judgment in question is susceptible to policy analysis.

Here, the relevant policy, as set out in the MSC SOM and the contract between Crowley and MARAD, required those operating the Cape Inscription to maintain the vessel in the highest state of readiness, and to be able to achieve and maintain "flank speed." However, determining how the vessel was to be maintained in this state of readiness, including how the vessel's boilers were to be operated, was left to the discretion of those operating the vessel.

Determining how to appropriately maintain the Cape Inscription's readiness, and specifically how to operate the boilers in a manner that would do so, is a matter that is at the least susceptible to policy analysis.  Under the guidance of relevant binding precedence, this court must therefore presume that, in choosing to keep both boilers on line, those responsible for operating the Cape Inscription were exercising their discretion as to a matter of policy. See, e.g., Gaubert, 499 U.S. at 324-25 (where established policy allows for exercise of discretion, court must presume agent's acts "are grounded in policy when exercising that discretion.")

13 - OPINION AND ORDER

As noted above, plaintiffs moved to strike the MSC SOM from the court's consideration, and to strike the motion to dismiss, on the grounds that this document was improperly withheld during discovery. I denied that motion because I concluded that the question of this court's subject matter jurisdiction took precedence over any potential discovery violation. The lack of subject matter jurisdiction cannot be waived by the parties' express consent, conduct, or estoppel, and lack of subject matter jurisdiction can even be raised for the first time on appeal. See, e.g., United States v. Ceja-Prado, 333 F.3d 1046, 1049 (9th Cir 2003) (parties cannot create federal jurisdiction through waiver, estoppel, or malfeasance; appellate courts must address subject-matter jurisdiction even if neglected by parties or raised first time on appeal). Under these circumstances, I concluded that, to the extent that the MSC SOM was relevant to the question of subject matter jurisdiction, the document should be considered. However, had I concluded that the MSC SOM was not admissible, I would nevertheless still conclude that this court lacks subject matter jurisdiction, because the obligation of the operators of the Cape Inscription to maintain the vessel in the highest state of readiness is also set out in the contract between Crowley and the Navy, which was produced during discovery. Even if I did not consider the MSC SOM, I would conclude that decisions concerning the operation of the Cape Inscription's boilers while the vessel was docked in the Port of Antwerp were susceptible to analysis pursuant to policies regarding the vessel's required state of readiness set out in the contract.

Plaintiffs contend that the decision to keep both boilers on line while in port was not subject to discretionary function immunity because the operation of the boilers implicates only technical engineering practices that are not susceptible to policy analysis. I disagree. Defendant has submitted evidence that a decision to shut down one of the boilers was for the ship's Captain, and not the vessel's Chief Engineer, to make. In his declarations submitted in support of the motion to dismiss, Captain Darley has stated that, if the ship's Chief Engineer had consulted him about shutting down one boiler, his decision would not have been made based upon technical engineering data, engineering standards and practices, fuel costs, or the

convenience of the crew, but upon the effect this action would have on the ship's ability to immediately respond to an order to get underway.

Plaintiffs have shown the existence of substantial evidence supporting the conclusion that the Cape Inscription emitted the oily soot that damaged hundreds of vehicles at the Port of Antwerp in September, 2004.  For the purposes of analyzing the pending motion, I assume that the Cape Inscription was the source of the contamination that damaged these vehicles.  However, the only theory of causation for which plaintiffs have produced any evidence whatsoever is the decision to operate both of the Cape Inscription's boilers while the vessel was in port.  I need not and do not reach the question whether plaintiffs' evidence is sufficient to support the conclusion that the decision to operate both boilers caused the damages, or whether, if so, that decision may have been negligent.  Operation of the vessel's boilers was a matter of discretion which is susceptible to analysis concerning the policy requirement, set out both in the MSC SOM and the contract between Crowley and the Navy, that the Cape Inscription be maintained in the highest level of readiness and operation while in "O" status.  Under the guidance of relevant precedents, I must conclude that the discretionary decisions concerning the operation of the Cape Inscription's boilers were "grounded in policy."  Because discretionary function immunity attaches to those decisions, this court lacks subject matter jurisdiction, and defendant's motion to dismiss on that basis must be granted.

3. Applicability and effect of *res ipsa loquitur* on disposition of defendant's motion to dismiss

In their response to defendant's motion to dismiss, plaintiffs briefly discuss the applicability of *res ipsa loquitur* to this action.  Plaintiffs note that Captain Darley testified that, in his 35 years at sea, he had never seen a similar incident in which a ship had contaminated vehicles at a pier.  Plaintiffs assert that this is the sort of incident, involving an

event that ordinarily does not occur in the absence of negligence, to which *res ipsa loquitur* analysis applies.[2]

There is no question that, where appropriate, *res ipsa loquitur* applies in admiralty actions such as this.  See, e.g., Johnson v. United States, 333 U.S. 46 (1948); Larkins v. Farrell Lines, Inc., 806 F.2d 510 (4th Cir. 1986).  In order for *res ipsa loquitur* to apply, a plaintiff must establish that: (1) the event in question is of a type that ordinarily does not occur in the absence of negligence; (2) at the time of the incident, the instrumentality causing the injury was within the exclusive control of the defendant; and (3) the incident was not due to any voluntary action or contribution on the part of the plaintiff.  Larkins, 806 F.2d at 513 (citing  Olsen v. States Line, 378 F.2d 217, 220 (9th Cir. 1967); Savard v. Marine Contracting, Inc., 471 F.2d 536, 542 (2d Cir. 1972)).

Assuming for the purposes of this analysis that the Cape Inscription was the source of the oily material that damaged the vehicles, the second and third of these requirements are satisfied.  The first requirement poses a more difficult question, because the mere fact that an accident has happened "does not give rise to a *res ipsa* inference of negligence or breach of duty under . . . general maritime law."  Id.  If  " 'the balance of possibilities' might reasonably be found in favor of negligence," a trier of fact is required to consider whether *res ipsa loquitur* applies.  Id.  However, if it is equally probable that damages resulted from an act that was not negligent, "*res ipsa loquitur* cannot apply."  Id. (citing W. Prosser and W. Keeton, *Law of Torts*, 248-49, 257-58 (5th ed. 1984)).

If the record before the court could reasonably support the conclusion that conduct on the part of defendant which was not shielded by discretionary function immunity caused the damage to the vehicles in Antwerp, *res ipsa loquitur* might apply.  However, the evidence will not support that conclusion.  In the face of the evidence from plaintiff's expert that a discharge of oily soot most probably was caused by the operation of both boilers on the Cape

---

[2]Of course, plaintiffs' reliance on res ipsa loquitur is inconsistent with their assertion that the damage resulted from the decision to operate both boilers while the Cape Inscription was in port.

Inscription, an act that is protected by discretionary function immunity, a reasonable trier of fact could not conclude that the damages were more likely than not caused by some other, negligent, act.  Assuming that the Cape Inscription caused the damage at issue, the <u>only</u> evidence of causation points to operation of both of the Cape Inscription's boilers while in port.  For the reasons discussed above, discretionary function immunity precludes liability for the decision to operate both boilers.


4.  <u>Plaintiffs' citation to the law of nuisance</u>

  In their response to defendant's motion to dismiss, plaintiffs also assert that defendant is liable for nuisance because its "Vessel emitted soot which caused severe damage to plaintiff's vehicles, imputing plaintiffs in the free use and enjoyment of their property."

  Private nuisance claims are viable under the principles of general admiralty law that apply to this action.  <u>See</u>, <u>e.g.</u>, <u>Nissan Motor Corp. v. Maryland Shipbuilding and Drydock Co.</u>, 544 F. Supp. 1004, 1117-20 (D. Md. 1982).  However, whether characterized as a negligence claim or as a nuisance claim, plaintiffs' cause of action is brought pursuant to the PVA and SAA.  As noted above, the exception to the waiver of sovereign immunity for discretionary functions set out in the FTCA applies to claims brought under these Acts.  Assuming that the soot that damaged the vehicles came from the Cape Inscription, the only cause of the discharge for which plaintiff has produced any evidence is the operation of both boilers while in port.  For the reasons discussed above, the decision to operate both boilers was subject to discretionary function immunity.  Accordingly, assuming that plaintiffs could otherwise establish a nuisance claim against defendant based upon the contamination of the vehicles in Antwerp, that claim, like a negligence claim, is barred by discretionary function immunity.


5.  <u>Plaintiffs' Supplemental Memorandum in Support of Motion to Dismiss</u>

  On March 3, 2009, several months after the deadline for responding to defendant's motion to dismiss had passed, and without seeking leave of the court to do so, plaintiffs filed

a supplemental memorandum in opposition to the motion to dismiss.  Plaintiffs support the memorandum with the declaration of James Dolan, their expert who has opined that the Cape Inscription discharged soot because both boilers were kept "on line" while the vessel was in port.

In this memorandum, plaintiffs note that defendant has argued that the crew of the Cape Inscription kept both boilers on line because it was necessary to keep the vessel fully operational and capable of leaving the port immediately if so ordered.  Based upon the supplemental declaration of Dolan, plaintiffs argue that the "operational condition" of the Cape Inscription while it was docked at the HNN terminal was "inconsistent with that argument," because a review of the vessel's deck and engine logs shows that the "main engines" were shut down after the vessel arrived at the port, and not restarted for nearly 34 hours.  Plaintiffs add that the vessel could not depart before divers inspected the vessel's hull, and that it could not leave the terminal until a "Belgian based docking pilot and master pilot took her off the dock and navigated her down the river."  Plaintiffs note that two tugs were tied to the Cape Inscription while the vessel went through the locks and during part of the vessel's transit of the Schelde River, that the vessel was held in the locks for approximately an hour, and that the last pilot did not leave the vessel until approximately 10 hours after the vessel had left the terminal.

Plaintiffs contend that, because a boiler could be brought back "on-line" in less than three hours, defendant's argument for having both boilers on line at the terminal is false, and that the contention that both boilers needed to be operational in order to make "flank speed" is irrelevant because the vessel could not achieve that speed in any event during the many hours that it took to clear the port with the aid of tugs.  They assert that a vessel, like a car, is "fully operational" and is "still capable of making its top speed" even if it is temporarily turned off.

In response, defendant has not moved to strike the supplemental material, but instead asks that, if the court considers these materials, it also considers additional declarations of the Cape Inscription's captain and chief engineer submitted by defendant.  In his

18 - OPINION AND ORDER

supplemental declaration, John Daly, the chief engineer, describes the operation of the Cape Inscription's steam propulsion system.  Daly states that it takes up to four and a half hours to safely bring either of the Cape Inscription's boilers on line, that the valves between the boilers and the turbines are closed for safety purposes while the vessel is tied up, and that, if the boilers are operating, power can be restored through the turbines to the screws in as little as 15 to 20 minutes.  Daly reiterates that the decision to keep both boilers on line was consistent with the requirement that the Cape Inscription be kept "in the highest state of readiness and operation."

In his supplemental declaration, Captain Darley disputes the implications of Dolan's assertions.  Darley notes that Dolan implies that shutting down one boiler would not delay the Cape Inscription's departure because the second boiler could be brought on line while the vessel was leaving the port.  Darley states that this assertion is erroneous because the vessel needed to have "its full power capability" while maneuvering through the busy and congested port.  Darley states that "getting underway with half the ship's propulsion system operating would not be an option," and notes that, if one boiler failed during transit, the ship "would be operating without any propulsion system, as well as other non-propulsion related equipment that is powered by the ship's steam plant."  He adds that having a tug or tugs present "would not change those considerations since in its outbound transit the CAPE INSCRIPTION was not under dead tow and operated on its own primary propulsion and steering."  Darley states that it would be "highly irresponsible" to get underway without full power, and opines that it is unlikely that port authorities would allow a vessel to do so.  Darley adds that "undocking the CAPE INSCRIPTION and getting underway with one of the two boilers not operating would have been completely contrary to the policy" requiring the vessel to be maintained in the "highest state of readiness and operation" after it was activated to Phase O.

Though plaintiff's supplemental memorandum and supporting declaration are not timely, and are based upon information the plaintiff had obtained before defendant moved to dismiss, I have considered this material and defendant's response so that all arguments concerning the pending motion can be fully evaluated on the merits.

19 - OPINION AND ORDER

Plaintiff's supplemental memorandum and declaration do not alter the conclusion that defendant's motion to dismiss should be granted.  Nothing in this material casts doubt upon the conclusion that the decision as to whether to operate both boilers while in port involved elements of judgment or choice, which was at least susceptible to the kind of policy analysis that is protected under discretionary function immunity.  Captain Darley and Chief Engineer Daly present substantial evidence supporting the conclusion that, though transiting the Port of Antwerp took many hours, if the Cape Inscription had received emergency orders, its exit from the port could have been substantially delayed if the second boiler was not on line. However, even if it appeared that these officers had not actually made the analysis set out in their supplemental declarations, or were mistaken in their conclusions, the decision to operate both boilers while in port would be protected by discretionary function immunity. As noted above, this immunity applies where a decision is "susceptible to policy analysis," Nurse, 226 F.3d at 1001, rendering questions of fault irrelevant.  Mitchell, 787 F.2d at 468.


6. Effect of absence of any evidence of causation other than operation of both boilers

In the discussion above, I noted that plaintiffs cite as causes for the Cape Inscription's alleged discharge of sooty materials the failure to pre-test fuel and the operation of both of the vessel's boilers while in the port of Antwerp.  In addition, as is also discussed above, plaintiffs assert that they should be allowed to establish their claim under the principles of res ipsa loquitur.

Defendant's motion to dismiss is, of course, based upon the assertion of James Dolan, plaintiff's expert, that the Cape Inscription discharged oily soot because both of the vessel's boilers were operated while in port.  When asked if he had identified any other causes for the alleged discharge, Dolan said that "[t]here really isn't any other."  However, during oral argument concerning the pending motion to dismiss, plaintiffs asserted that the operation of both boilers is simply one possible cause of the incident, and argue that they should be allowed to establish at trial that something else caused the Cape Inscription to emit oily soot.

I disagree.  As noted on page 6 above, where, as here, a factually based motion to dismiss for lack of jurisdiction is supported by evidence, the nonmoving party must provide evidence supporting the conclusion that the court has subject matter jurisdiction.  E.g., Savage, 343 F.3d at 1039 n.2.  Defendant's motion to dismiss was based upon the only theory of causation for which plaintiff has supplied any evidence.  Plaintiff's expert did not state that the operation of two boilers was one of several possible causes of the sooty discharge.  Likewise, there is no evidence before the court that this was the sort of incident that does not occur in the absence of negligence.  Instead, the only evidence is that the operation of both boilers while in port was the cause.

Having identified a cause of the contamination that damaged the vehicles, and having informed defendant of their conclusion as to that sole cause, plaintiffs cannot now rely on the argument that some other cause might be established at trial, or on the argument that if no cause is established, they might show that this sort of incident does not occur in the absence of negligence.  In the face of one proffered explanation that is supported by evidence, which is based upon conduct that is subject to discretionary function immunity, a trier of fact could not reasonably conclude that the damages resulted from some unidentified cause for which no evidence has been cited.  At this stage of the proceedings, it is not enough for plaintiffs to simply assert that they might prove a different causation at trial.  Discovery has long been concluded, and the experts have formed their opinions, written their reports, and been subject to deposition.  Under Fed. R. Civ. P. 26(a)(2)(B), an expert's report must "contain a complete statement of all opinions to be expressed and the basis and reasons therefor . . . ."  After expert disclosure is made, it must be kept current.  E.g., Macaulay v. Anas, 321 F.3d 45, 50 (1st Cir. 2003) (citing Fed. R. Civ. P. 26(e)(1)).  If plaintiffs had any evidence of a causation that was not subject to discretionary function immunity, it needed to be put forth in response to the pending motion to dismiss.  In the absence of any citation to other evidence, the court must conclude that plaintiffs have no additional evidence supporting the conclusion that a discharge of oily soot from the Cape Inscription resulted from any other cause than the operation of both boilers.

21 - OPINION AND ORDER

In concluding that plaintiffs cannot now proceed to trial in hopes of convincing a trier of fact that the Cape Inscription emitted damaging soot for some as yet unidentified reason, I must reiterate that it is this court's subject matter jurisdiction that is at issue here.  "Federal courts are courts of limited jurisdiction."  United States v. Marks, 530 F.3d 799, 810 (9th Cir. 2008).  Plaintiffs, as the parties invoking federal jurisdiction, bear the burden of establishing the existence of this court's jurisdiction.  Id.  In their response to defendant's motion to dismiss, plaintiff's have not sustained that burden.  Under these circumstances, I cannot permit the action to go forward based upon the possibility that plaintiffs may yet discover a cause for their damage for which defendant is not immune, because a court lacking jurisdiction " 'cannot proceed at all in any cause.' "  Santos v. Guam, 436 F.3d 1051, 1055 (9th Cir. 2006) (quoting Ex Parte McCardle, 74 U.S. 506, 514 (1868)).

## <u>CONCLUSION</u>

Defendant's motion to dismiss for lack of subject matter jurisdiction (#63) is granted.

DATED this 15th day of  April, 2009.

/s/  John Jelderks_____
John Jelderks
U.S. Magistrate Judge

22 - OPINION AND ORDER